ELMER STANKE, *Appellant*, v. SPOKANE, COEUR
D'ALENE & PALOUSE RAILWAY COMPANY,
*Respondent.*[1]

*Tustin & Chandler,* for appellant.

*Ernest E. Sargeant, William Ennis,* and *Charles S.
Albert,* for respondent.

[1]Reported in 43 P. (2d) 961.

BLAKE, J.—This is an action brought under the Federal Employers' Liability Act.

Defendant operates an electric railway system in eastern Washington and northern Idaho. Plaintiff, for more than twenty years prior to his injury, had been employed as a wireman on the system. On April 24, 1933, while engaged in his occupation as such, he came in contact with a high voltage wire and sustained injuries which he alleges to be the result of negligence on the part of defendant. Answering the complaint, defendant denied negligence and set up, by way of affirmative defenses, contributory negligence and assumption of risk. Upon trial of the issues thus made, a jury returned a verdict for plaintiff. Defendant interposed motions for judgment notwithstanding the verdict and for new trial. The court granted the former motion and denied the latter. From judgment entered dismissing the action, plaintiff appeals.

Since, under the Federal Employers' Liability Act, contributory negligence does not bar recovery, we are concerned with only two questions: (1) Was respondent negligent; and (2) was appellant's injury the result of an assumed risk? In order to answer these questions, a somewhat detailed statement of the facts must be made.

The shops and offices of the respondent are in Spokane. Appellant lived in Spokane. E. L. Blaine was superintendent of respondent's electrical substations. The respondent maintained one such substation at Rosalia. For several weeks prior to April 24, 1933, this substation was wired to carry a current of thirteen thousand volts. April 24th was a Monday. The preceding Friday, Blaine called appellant on the telephone at Spokane, and directed him to go to Rosalia on Monday and change the wiring in the substation so as to step the current up from thirteen thousand volts to

forty-five thousand volts. Appellant was thoroughly familiar with the procedure necessary to accomplish that result and thoroughly competent to do the work. He had, in fact, stepped the current down from forty-five thousand volts to thirteen thousand volts in the same substation on the preceding March 9th. According to instructions, he left Spokane by automobile about eight o'clock A. M., arriving at Rosalia some time after nine. He parked his car and proceeded to carry his tools to the substation, some three hundred feet away. He had made one trip and was making a second with his final load of tools, when he observed the work train, or tower car, approaching from Spokane. He went on into the substation.

Before following his movements further, we think it desirable to describe here, as accurately as we can, the interior of the switch room, where the work was to be done. It was a room fifteen feet wide and thirty feet long — the latter being the east and west dimension. The only entrance to the building was approximately in the middle of the east wall. The door to the entrance swung in and to the south. To the left as one entered the room, there was what was called a table, or platform. This platform was an L-shaped wooden structure. It was eight feet long, extending to the south wall of the room. The upright part (or back) was four feet high, and the floor was three and one-half feet wide. The structure weighed approximately three hundred pounds. It was designed to protect persons moving about the room from coming in contact with two oil switches and two high tension wires which were on the east wall of the room and south of the doorway.

The upright part of the L was adjacent to the oil switches and wires just mentioned. The handles of the oil switches extended through holes in the upright part

of the L, so that one could stand on the floor of the platform and open or disconnect the oil switches without danger of coming in contact with them or the high tension wires. When the door of the room was open, it swung back against the platform in such manner as to form a complete barricade to these oil switches and high tension wires. The high tension wires in question extended perpendicularly down the east wall into the oil switches from what were called the east and west trolly disconnecting switches. The latter were on the east wall of the room about twelve feet above the floor. There was a tie switch between the east and west trolly disconnecting switches.

A little to the north of the center of the room was what was called the circuit breaker. This was controlled by the opening and closing of an oil switch. On the north wall of the building were two knife switches, by the opening of which the forty-five thousand volt line could be cut out. On the south wall, there were similar switches on the thirteen thousand volt line. These switches were high above the floor, and had to be opened and closed by using a twelve foot bamboo pole. Up near the ceiling and about three feet from the south wall, extended (from east to west) what was called the forty-five thousand volt bus line. As we understand it, in order to step the current up, it was necessary to connect this bus line with the forty-five thousand volt line on the north wall. In order to do this, it was necessary that the circuit breaker and the switches on the forty-five thousand and thirteen thousand volt lines be opened.

Upon entering the switch room, after observing the approach of the tower car, Stanke opened the circuit breaker; opened the knife switches on the north and south walls; closed the tie switch between the east and west disconnecting trolly switches on the east wall;

and opened the oil switch beneath the west disconnecting switch. This was the northerly of the two oil switches, the handles of which extended through holes in the upright part, or back, of the platform. In order to open these switches, he stood on the floor of the platform. As he was starting to open the southerly of these oil switches, Blaine came into the room, followed by two men carrying a ladder. One of these men, McLean, was Stanke's helper. All three had come down from Spokane on the tower car.

According to appellant, Blaine entered the room with a rush, and said:

"They have got the base done for the motor for Palouse. We must hurry and get this job done because tomorrow we have to go to Palouse to put the motor in the elevator. They are coming with the ladder, let's pull this platform out."

Thereupon, Blaine, Stanke and McLean pulled the platform barrier away from the oil switches out toward the middle of the room to a point where the ladder could be set up for the work of making the connection with the forty-five thousand volt bus line. The base of the ladder rested on the floor of the platform, and the top against the south wall. McLean ascended the ladder. It was found to be necessary to melt solder from the wire on which McLean was working. This had to be done with a blow torch. Stanke lighted the torch, carried it up the ladder, and handed it to McLean. Of what occurred after he descended the ladder and stepped on the floor of the platform, he has no recollection. McLean saw him step off the platform, walk around behind it (between it and the east wall), where a moment later he came in contact with the live wire leading down from the east disconnecting switch into the oil switch below.

I. That plaintiff made a case of negligence for

the jury, seems to us hardly debatable. It was respondent's duty to provide and maintain a reasonably safe place for appellant to work. This is a non-delegable duty. *Howland v. Standard Milling & Logging Co.*, 50 Wash. 34, 96 Pac. 686. Blaine was superintendent of substations, having direct supervision over this one at Rosalia. He was Stanke's immediate superior. The barrier had been designed, made and maintained for the specific purpose of keeping workmen from coming in contact with the oil switches and the wires leading into them from the east and west disconnecting switches. It was fully adequate for the purpose. Had it been left in place, it would have been impossible for Stanke to have come in contact with the wire leading down from the east disconnecting switch into the southerly oil switch, unless he had climbed over the back of the barrier.

When Blaine came in and ordered the barrier moved out into the room, he acted as a vice-principal of respondent. In so doing, he not only failed to provide a safe place for the workmen, but, as the event proved, rendered a place unsafe which had theretofore been safe. It is no answer to this to say that the work Stanke was doing did not call for his presence behind the barrier. It is clear to us that, but for the removal of the barrier, Stanke would not have been injured. The cycle of negligence, proximate cause and injury is complete. So far as respondent's negligence is concerned, appellant made a case for the jury.

II. But that does not solve our problem. We are still confronted with the doctrine of assumption of risk. For, notwithstanding injury may be the proximate result of the master's negligence, recovery may be precluded under the doctrine of assumption of risk. *Imbler v. Spokane, Portland & Seattle Ry. Co.*, 164 Wash. 299, 2 P. (2d) 895; *Boldt v. Pennsylvania R.*

*Co.*, 245 U. S. 441, 38 S. Ct. 139; *Delaware, L. & W. R. Co. v. Koske*, 279 U. S. 7, 49 S. Ct. 202. And in determining the question of whether or not the risk is assumed, we are governed by the decisions of the supreme court of the United States. *Imbler v. Spokane, Portland & Seattle Ry. Co., supra; Chesapeake & Ohio Ry. Co. v. Stapleton*, 279 U. S. 587, 49 S. Ct. 442. In considering the question, however, we are bound to consider the evidence in the light most favorable to appellant, and to draw such inferences in support of the verdict as the evidence will reasonably justify. *Mattson v. Griffin Transfer Co.*, 90 Wash. 1, 155 Pac. 392.

The solution of the problem presented necessitates a further consideration of the facts. It seems clear from the evidence that it was Stanke's intention to open the southerly oil switch and to open the east and west disconnecting switches. It is also a fair inference from the evidence that he would have done so had it not been for Blaine's entry and hurry-up orders made and given while he was in the act of opening the southerly oil switch. In other words, it is fair to infer that, had Stanke been left to pursue the work in his own way, he would have eliminated the danger of contact with the southerly oil switch and the wire leading down to it from the east disconnecting switch, notwithstanding the removal of the barrier.

But, granting these inferences and viewing his testimony in the most favorable light, we do not think the further inference can be drawn that he did not know the wire leading from the east disconnecting switch down to the oil switch was hot. He knew that, with the east disconnecting switch closed, the wire carried six thousand six hundred volts. He must have known that he did not open that switch. The risk of injury from coming in contact with the wire when the switch was closed, it seems to us, was obvious. It also seems clear

that the risk of injury from coming into contact with high voltage wires is a usual and ordinary risk connected with appellant's occupation. The fact that the risk was extrahazardous does not render it extraordinary. It was a risk of which appellant, according to his own testimony, was cognizant. His injury can be accounted for only on the theory that he momentarily forgot that the east disconnecting switch had not been opened. He knew, or must have known, such to be the fact, for he was interrupted when he was in the process of opening it. Now, does his momentary forgetfulness, under the stress of Blaine's "hurry up" orders, relieve him of the assumption of a risk which, otherwise, he clearly assumed?

There are some decisions of this court which, by analogy at least, would justify an affirmative answer to the question. *King v. Griffiths-Sprague Stevedoring Co.,* 45 Wash. 425, 88 Pac. 759; *Passage v. Stimson Mill Co.,* 52 Wash. 661, 101 Pac. 239. These cases hold that a servant, engrossed in his work and acting under the directions of a superior, is not necessarily guilty of contributory negligence in subjecting himself to danger, the existence of which has come to his attention but which he has momentarily forgotten.

This rule, however, is not consonant with the rule laid down by the supreme court of the United States with respect to the servant's assumption of risk under such circumstances. That court, in *Jacobs v. Southern Railway Co.,* 241 U. S. 229, 36 S. Ct. 588, held that momentary forgetfulness did not relieve the servant of the assumption of a risk of which he had previous knowledge. See, also: *Southern Pacific Co. v. Berkshire,* 254 U. S. 415, 41 S. Ct. 162. The United States circuit court of appeals for the sixth circuit has in two cases followed the rule so laid down: *New York, C. & St. L. R. Co. v. McDougall,* 15 Fed. (2d) 283; *Grand*

*Trunk Western Ry. Co. v. Reid,* 42 Fed. (2d) 403. Nor does the fact that appellant was acting under "hurry up" orders from his superior relieve him of the assumption of risk. *Chesapeake & Ohio Ry. Co. v. Kuhn,* 284 U. S. 44, 52 S. Ct. 45.

Bound, as we are, by the law, as laid down by the supreme court of the United States, we see no escape from the conclusion reached by the trial court on the motion for judgment notwithstanding the verdict.

Judgment affirmed.

MILLARD, C. J., HOLCOMB, STEINERT, and MAIN, JJ., concur.